## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

_____

LUV N' CARE, LTD.,

                         **Plaintiff,**

v.

ETG CAPITAL LLC

And

MAGLAN DISTRESSED MASTER
FUND LP,

                        **Defendants.**

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**CASE NO.:  ____CV_____**


**COMPLAINT**

      Plaintiff, Luv n' care, Ltd. ("LNC" or "Plaintiff"), through its undersigned counsel, brings this action for breach of contract against Defendants, ETG Capital LLC ("ETG") and Maglan Distressed Master Fund LP ("Maglan"; and together with ETG, "Defendants"), and alleges as follows:

### INTRODUCTION

      1.     This action arises from the failure and refusal of Defendant ETG to honor the terms of its contract with Plaintiff.

      2.     LNC is a manufacturer and distributor of baby products, whose customers included Toys "R" Us – Delaware, Inc. ("Toys Delaware" or the "Company").  After Toys Delaware and several of its affiliates (collectively, the "Debtors") filed for bankruptcy in September 2017, LNC sought to hedge its risk by purchasing a put for certain of its accounts receivable – the right to sell the Toys Delaware account receivables to an investor.  In November 2017, LNC and one of its affiliates paid ETG, a New York-based hedge fund, $175,500 for the

right to put to ETG certain post-petition Toys Delaware accounts receivable ("Account Claims") to ETG should one or more Specified Event[1] (in this case the bankruptcy court's final order authorizing Toys Delaware to cease operating its business in the ordinary course) occur before August 8, 2018 (the applicable Expiration Date).  In March 2018, approximately 4 months after LNC and ETG entered into their put agreement, the bankruptcy court entered an order authorizing Toys Delaware to wind-down and cease its U.S. operations, and thus cease operating in the ordinary course.

3.      LNC has fully complied with the terms of the parties' contract, including giving all appropriate notices and disclosures required therein, and timely executing an assignment of the Account Claims.  Nevertheless, ETG has failed and refused to schedule a closing or to pay LNC the $726,164.25 Schedule Purchase Price, as the parties agreed.

4.      Maglan guaranteed payment of ETG's obligations and, upon information and belief, is controlled by the same principals as ETG.

5.      LNC has made numerous efforts since April 2018 to consult with ETG concerning LNC's response or non-response to bankruptcy pleadings potentially affecting the Account Claims in order to forestall any later arguments by ETG that LNC's actions or inactions in response to such pleadings somehow amounted to impairment of the Account Claims or otherwise failed to satisfy any of the convoluted, burdensome, and ambiguous conditions precedent required of LNC under the parties' contract.  Despite LNC's efforts in this regard, ETG repeatedly failed to respond to such communications or provided only vague and unhelpful responses thereto, which in turn required LNC to jump through additional hoops and incur

---

[1] All capitalized terms not defined in this Complaint shall have the meaning ascribed to them in the Master Agreement (defined below), the Exhibits thereto, and/or the Confirmation (defined below) entered into in connection therewith, as applicable.

additional burden and expense in enforcing its rights under the put agreement.  At no time during any of these communications did ETG ever once raise its absurd argument that the Bankruptcy Court's March 2018 Wind-Down Order did not authorize Toys Delaware to cease operating its business in the ordinary course and thus did not constitute a triggering event under the put agreement.  Rather, ETG first raised that argument on February 10, 2019, after LNC had already incurred significant additional burden and expense (due largely to ETG's failures to communicate in good faith in an attempt to hinder and frustrate LNC's performance) to satisfy all of the other burdensome conditions precedent required of it under the put agreement to trigger ETG's duty to close the sale and purchase the Account Claims.

6.      Accordingly, Defendant ETG is liable to Plaintiff for breach of contract, and Defendant Maglan is liable to Plaintiff pursuant to its guaranty of ETG's obligations under the put agreement.

## PARTIES

7.      LNC is a business corporation organized and existing under the laws of the State of Louisiana and has its principal place of business in Monroe, Louisiana.  LNC  manufactures and distributes plastic baby bottles and other baby products under the trade name Nuby, which products it sells to retail distributors such as Toys Delaware.  Plaintiff maintains an office at 3030 Aurora Avenue, Monroe, LA 71201.

8.      Upon information and belief, Defendant ETG is a limited liability corporation organized and existing under the laws of the State of Delaware and having its principal place of business in the City, County and State of New York.  Upon information and belief, Defendant ETG operates a New York-based hedge fund.  A business entities search of Delaware's Department of State, Division of Corporations website shows no registered agent currently listed

for Defendant.  However, upon information and belief, Defendant maintains an office at, and

may be served at, the following address:

> Attn: Steven Azarbad, Managing Member
> ETG Capital LLC
> 25 West 39th Street
> 2nd Floor, 5th Floor, 9th Floor  and/or  16th Floor
> New York, NY 10018

Upon information and belief, ETG's phone number is (212) 300-6790 and/or (212) 300-6700.

ETG's email address is steven.azarbad@etg-capital.com.

9.      Upon information and belief, Defendant Maglan is a limited partnership

organized and existing under the laws of the Cayman Islands and having its principal place of

business in the City, County and State of New York.  Upon information and belief, Maglan

operates a hedge fund and maintains an office at, and may be served at, the following address:

> Attn: Steven Azarbad, Managing Member
> Maglan Distressed Master Fund LP
> 25 West 39th Street
> New York, NY 10018

Upon information and belief, Maglan's phone number is (212) 300-6700 and has an email

address of steven.azarbad@etg-capital.com.

## **<u>SUBJECT MATTER JURISDICTION</u>**

10.     As set forth above, Plaintiff and each Defendant are citizens of different states

within the meaning of 28 U.S.C. § 1332(a)(1).

11.     The amount in controversy in this action exceeds $75,000, exclusive of interest

and costs.

12.     Accordingly, this Court has original jurisdiction of this action pursuant to 28

U.S.C. § 1332(a).

## PERSONAL JURISDICTION AND VENUE

13.     Personal Jurisdiction and venue are proper in this Court as the Defendants'

residence and principal place of business is located in the City, County and State of New York

and the causes of action set forth herein are based upon agreements entered into in the State of

New York.  In addition, the agreement with defendant out of which the claims alleged herein

arise provides as follows:

> THIS MASTER AGREEMENT SHALL BE GOVERNED BY AND
> CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE
> OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE
> PERFORMED ENTIRELY WITHIN SUCH STATE.  SELLER AND
> PURCHASER HEREBY IRREVOCABLY CONSENT TO THE
> JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED
> WITHIN THE COUNTY AND STATE OF NEW YORK AND
> IRREVOCABLY AGREE THAT ALL ACTIONS OR PROCEEDINGS
> RELATING TO THIS MASTER AGREEMENT AND ANY RELATED
> CONFIRMATION SHALL BE LITIGATED IN SUCH COURTS
> WAIVING ANY DEFENSE OF FORUM NON CONVENIENS….

Master Agreement (defined below), § 13.

## STATEMENT OF CLAIM

14.     LNC and its affiliate Talbot's Pharmaceuticals Family Products, LLC

("Talbot's"), each as Seller, and ETG, as Purchaser, are parties to that certain Master Claims

Purchase Agreement dated as of November 9, 2017 (the "Master Agreement"), pursuant to

which, from time to time, for a specified Put Fee to be paid by Seller, the parties may enter into

certain Puts, covering certain Accounts Receivable, for the right of Seller to sell, transfer and

assign the Account Claims to Purchaser upon the occurrence of certain Specified Events in

exchange for a specified agreed upon Purchase Rate.

15.     As of November 9, 2017, LNC and Talbot's, each as Seller, and ETG, as

Purchaser, entered into that certain Confirmation confirming the terms and conditions of a Put

issued by ETG pursuant to the terms of the Master Agreement (the "Confirmation"; and together with the Master Agreement, the "Put Agreement").  A true and complete copy of the Put Agreement is attached as **Exhibit 1** hereto.

16.     In addition, the Confirmation contains a guaranty of ETG's obligations by Maglan (the "Guaranty").  The Confirmation states, in relevant part:

> In connection with this Put, Maglan Distressed Master Fund LP (the "Guarantor") hereby agrees to guarantee the payment obligations of the Buyer to Seller.

17.     ETG solicited LNC and Talbot's to enter into the Put Agreement by sending an unsigned version of the Master Agreement and Confirmation attached hereto as Exhibit 1 to Joseph Hakim, the president of both LNC and Talbot's, and Mr. Hakim accepted ETG's offer on behalf of both companies by executing and returning the Put Agreement to Steven Azarbad (who is the Managing Member of ETG and the Managing Member of the General Partner of Maglan) and paying the Put Fee Payment required by the Confirmation within the required deadline, as described below.

18.     Pursuant to the terms of the Put Agreement, on or before November 10, 2017, LNC and Talbot's paid ETG a total Put Fee Payment in the amount of $175,500 (calculated at the rate of 1.95% per month) in consideration for the right, upon the occurrence of a Specified Event at any time before the August 8, 2018 Expiration Date and the satisfaction of certain other terms and conditions of the Master Agreement, to sell, transfer, and assign to ETG up to $1,000,000 of Seller's Accounts Receivable owing by Toys Delaware in exchange for payment from ETG equal to a Purchase Rate of 100% of the Net Account Value of the Accounts Receivable that are or become allowed administrative expense claims against the Company within the meaning of section 503(b)(1)(A) of the Bankruptcy Code.

19.     Pursuant to the terms of the Put Agreement, a "Specified Event" is defined as a

"Bankruptcy Event or upon the emergence of the Company from Chapter 11 the Specified Event

will be a Bankruptcy Filing."  Confirmation, Item 10.

20.     Pursuant to the terms of the Put Agreement, a Bankruptcy Event is defined

as follows:

>    "<u>Bankruptcy Event</u>" means the Bankruptcy Court has entered final orders:
>    (A) converting the Company's Chapter 11 case to a case under Chapter 7
>    of the Bankruptcy Code, (B) authorizing the company to cease operating
>    its business in the ordinary course, (C) confirming a liquidating plan of
>    reorganization under Chapter 11 to commence an orderly liquidation of its
>    assets, or (D) authorizing the Company to make distributions to
>    administrative expense creditors that do not provide for payment in full of
>    the Accounts Receivable.

Master Agreement, § 1 ("Bankruptcy Event").

21.     Section 4 of the Master Agreement, entitled "Assignment of Account Claims,"

provides as follows:

>    (a)     In order to exercise a Put, Seller must notify Purchaser of its
>    intention to sell, transfer and assign Account Claims, by
>    irrevocable written notice (the "<u>Assignment Notice</u>"), to Purchaser
>    if a Specified Event occurs prior to the Expiration Date.  The
>    Assignment Notice shall specify (i) in reasonable detail, Seller's
>    Claims with respect to such Accounts Receivable that are Eligible
>    Accounts (the "<u>Account Claims</u>") being sold, transferred and
>    assigned to Purchaser, (ii) the Net Account Value of such Eligible
>    Accounts, which amount is subject to verification and agreement
>    by Purchaser, and (iii) the account to which Purchaser shall pay the
>    Schedule Purchase Price on the Closing Date…. The Assignment
>    Notice is effective if delivered by Seller and received by Purchaser
>    on or before 5:00 p.m. (New York time) on a date that is within
>    twenty (20) days of the date of the Specified Event, and only if the
>    Specified Event occurs prior to the Expiration Date.

>    (b)     Subject to the conditions set forth in <u>Section 8</u>, on the Closing
>    Date, Purchaser shall pay the Schedule Purchase Price to Seller in
>    immediately available funds in United States dollars by wire
>    transfer to Seller's account set forth on the signature page of the
>    Assignment Notice.  Upon receipt by Seller of the Schedule

7

Purchase Price, Purchaser shall be the absolute owner of the Account Claims.

22.    Section 5 of the Master Agreement, entitled "Closing," provides as follows:

(a)    If an assignment is properly issued, and the conditions set forth in <u>Section 8</u> are satisfied on or prior to the twenty-fifth (25th) day after (i) in the case of a Prepetition Put, the initial filing of the Company's Schedule of Assets and Liabilities, or (ii) in the case of a Postpetition Put, the Account Claims are allowed by a final order of the Bankruptcy Court (including an approved settlement) as administrative expense claims against the Company within the meaning of Section 503(b)(1)(A) of the Bankruptcy Code, then the closing of the sale and purchase of the Account Claims (the "Closing") shall take place (x) at the offices of Purchaser, at 9:00 a.m. (New York time), (y) by facsimile, or (z) by other form of electronic transmission, on a date which must be a Business Day and which shall be at least five (5) days but no more than twenty (20) days subsequent to the satisfaction by Seller of the conditions set forth in <u>Section 8</u>.  The time and date of the Closing are herein referred to as the "<u>Closing Date</u>."

(b)    In the event Seller does not satisfy the conditions set forth in <u>Section 8</u> prior to the expiration of the twenty-five (25) day period set forth in <u>Section 5(a)</u>, the Put shall be automatically canceled, discharged and terminated and will not be reinstated or rewritten, and Purchaser shall have no further obligation to Seller in respect of that Put.

23.    Section 8 of the Master Agreement, entitled "Conditions Precedent to Purchase of

Account Claims," provides as follows:

The obligation of Purchaser to purchase the Account Claims under a Put is subject to the satisfaction of the following conditions precedent:

(a)    Seller shall have executed the Assignment of Claim Agreement, substantially in the form of <u>Exhibit B</u> hereto, selling, transferring, and assigning the Account Claims to Purchaser (the "<u>Assignment Agreement</u>") in an amount equal to the Net Account Value of the Accounts Receivable that are Eligible Accounts being sold, transferred and conveyed to Purchaser;

(b)    Seller shall have delivered the Proof of Claim, as defined in the Assignment Agreement, in the form and with the content

reasonably required by Purchaser and a true and complete copy of the Proof of Claim, including all attachments, exhibits, schedules, modifications and amendments thereto, shall have been attached as an exhibit to the Assignment Agreement;

(c)     Purchaser, at the cost and expense of Seller, shall have received all instruments of sale, transfer, conveyance, assignment and confirmation required by Bankruptcy Rule 3001(e) and Seller shall have taken any other action as Purchaser may reasonably have deemed necessary or desirable in order to transfer, convey and assign to Purchaser, and to confirm Purchaser's title to, the Account Claims;

(d)     The representations and warranties of Seller set forth in this Master Agreement, including those contained in Sections 6, 7, and 10 of the Master Agreement, and the Assignment Agreement shall be true and correct in all respects as of the Closing Date; and

(e)     Seller shall have performed and complied in all respects with the covenants and agreements contained in this Master Agreement and the Assignment Agreement on its part to be performed and complied with by it.

### Toys Delaware Operations And Dealings With LNC And Talbot's

24.     Prior to its September 18, 2017 bankruptcy filing (the "Petition Date"), Toys Delaware and its affiliates that are debtors (collectively, the "Debtors") in the Toys "R" Us, Inc. *et al.* bankruptcy proceedings pending in the U.S. Bankruptcy Court for the Eastern District of Virginia (the "Bankruptcy Court"), jointly administered under Case No. 17-34665 (KLP) (the "Bankruptcy Case"), operated retail toy stores and specialty retail stores for baby products and furniture across 49 states in the U.S., Puerto Rico, Guam and 37 other countries.  Toys Delaware owned thirteen of the Debtors' U.S. retail properties and either leased or ground leased the Debtors' remaining U.S. retail properties.  In addition, Toys Delaware either owned or leased eight distribution and warehouse centers, which contained management systems that stored and supplied the merchandise for the North American operations, and leased its corporate headquarters.   In addition to holding these real estate assets, Toys Delaware served as the

operating company for the Debtors' U.S. retail business, and it wholly owned Toys "R" Us (Canada) Ltd./ Toys "R" Us (Canada) Ltee ("Toys Canada"), which operates the Debtors' Canadian business.  *See Disclosure Statement for the Chapter 11 Plans of the Toys Delaware Debtors and Geoffrey Debtors* (the "Disclosure Statement"), filed August 6, 2018 in the Bankruptcy Case (the "Disclosure Statement"), a copy of the relevant portions of which is attached as **Exhibit 2** hereto, at pp. 22-23.

25.     Prior to and after the Petition Date, LNC and Talbot's sold their manufactured goods to Toys Delaware pursuant to vendor agreements.

26.     Between January and April 2018, Toys Delaware failed to pay LNC and Talbot's invoices when due, in violation of the customary payment terms.

27.     On April 9, 2018, LNC and Talbot's each filed an Application For Allowance And Payment Of Administrative Expense Claim in the Debtors' Bankruptcy Case with respect to the Toys Delaware unpaid invoices.

## The U.S. Wind-Down Order

28.     On March 15, 2018, the Debtors filed a motion seeking, *inter alia*, to liquidate the existing inventory in all of the Debtors' remaining U.S. stores by conducting going-out-of-business sales pursuant to a Full Chain Consulting Agreement, to begin an orderly wind-down of their U.S. operations, to terminate substantially all of their U.S. employees, to establish an administrative stay barring the enforcement and collection of any administrative claim that is not authorized by a pre-determined Wind-Down Budget, and to establish procedures for the auction and sale of Toys Delaware's 100% equity interest in the Debtors' Canadian affiliates ("Toys Canada") (collectively, the "U.S. Wind Down").

29.     On March 22, 2018, the Bankruptcy Court entered an order (the "Wind-Down Order") authorizing the Debtors, *inter alia*, to begin conducting the U.S. Wind Down, to begin closing U.S. stores and warehouses and selling inventory and certain real estate assets, to sell and/or abandon certain furniture fixtures and equipment in connection with the store closing sales, and to alter customer return policies, gift card policies, and lay-away policies in connection with the store closing sales.  A copy of the Wind-Down Order is attached as **Exhibit 3** hereto; *see also* Disclosure Statement at p. 34.

30.     Paragraph 2 of the Wind-Down Order expressly provides that "the Debtors' implementation and effectuation of the U.S. Wind-Down is approved as set forth herein, pursuant to section 105(a) and 363(b) of the Bankruptcy Code."

31.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee after notice and a hearing, may use, sell, or lease, ***other than in the ordinary course of business***, property of the estate…." (Emphasis added).

32.     By June 30, 2018, the Debtors had successfully completed liquidation sales at all of their U.S. stores.  As of May 24, 2018, the Debtors had completed their sale of 100% of Toys Delaware's equity interest in Toys Canada to Fairfax Financial Holdings Limited.  *See* Disclosure Statement at p. 34.

33.     As of August 6, 2018, the Debtors had sought and obtained approval of the sale of the vast majority of its unexpired leases and real property and were in the process of finalizing documentation and obtaining final approval of additional properties that had been sold in July. *See* Disclosure Statement at p. 34.

### The Assignment Notices

34.     On April 9, 2018, LNC and its counsel timely sent an Assignment Notice on behalf of LNC to ETG and its counsel via facsimile and email (the "LNC Assignment Notice"). In accordance with the terms of the Master Agreement, the LNC Assignment Notice notified ETG that a Specified Event, identified therein as the Bankruptcy Court's entry of the Wind-Down Order, had occurred and that LNC intended to irrevocably sell, transfer and assign the Account Claims described therein to ETG.

35.     The LNC Assignment Notice identified the Account Claims to be assigned as the administrative expense claim pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(2), in the net amount of $726,164.25, asserted in the *Application of Luv n' care, Ltd. for Allowance and Payment of Administrative Expense Claim*, Docket No. 2589, filed April 9, 2018 on behalf of LNC in the Bankruptcy Case (the "LNC Administrative Claim").  Attached to the LNC Assignment Notice was a chart showing the purchase order number, invoice number, sales order number, invoice ship date, invoice due date, and amount of each unpaid invoice included in the LNC Administrative Claim.

36.     Also on April 9, 2018, Talbot's and its counsel timely sent an Assignment Notice on behalf of Talbot's to ETG and its counsel via facsimile and email (the "Talbot's Assignment Notice"; and together with the LNC Assignment Notice, the "Assignment Notices").  In accordance with the terms of the Master Agreement, the Talbot's Assignment Notice notified ETG that a Specified Event, identified therein as the Bankruptcy Court's entry of the Wind-Down Order) had occurred and that Talbot's intended to irrevocably sell, transfer and assign the Account Claims described therein to ETG.  Copies of the Assignment Notices are attached as **Exhibit 4** hereto.

37.     The Talbot's Assignment Notice identified the Account Claims to be assigned as the administrative expense claim pursuant to 11 U.S.C. §§ 503(b)(1) and 507(a)(2), in the net amount of $34,349.60, asserted in the *Application of Talbot's Pharmaceuticals Family Products, LLC for Allowance and Payment of Administrative Expense Claim*, Docket No. 2590, filed April 9, 2018 on behalf of Talbot's in the Bankruptcy Case (the "Talbot's Administrative Claim"; and together with the LNC Administrative Claim, the "Administrative Claims").  Attached to the Talbot's Assignment Notice was a chart showing the purchase order number, invoice number, sales order number, invoice ship date, invoice due date, and amount of each unpaid invoice included in the Talbot's Administrative Claim.

38.     By email dated April 10, 2018, ETG's counsel confirmed receipt of the Assignment Notices, stating, "Without waiving any rights, we received your email."  A copy of that email confirmation is attached as **Exhibit 5** hereto.

### Allowance Procedures And Debtors' Reconciliation Of Administrative Claims

39.     On May 25, 2018, the Bankruptcy Court entered an *Amended Order (I) Setting a Bar Date for Filing Proofs of Administrative Claims Against Certain Debtors, (II) Establishing Administrative Claims Procedures, (III) Approving the Form and Manner of Filing Proofs of Administrative Claims, (IV) Approving Notice of the Administrative Claim Bar Date, and (V) Granting Related Relief* [Docket No. 3260] (the "Administrative Claims Procedures Order"), which order is now a final order of the Bankruptcy Court within the meaning of section 5 of the Master Agreement and section 6 of the LNC Assignment Agreement (defined below).

40.     Pursuant to paragraph 18 of the Administrative Claims Procedures Order, the Debtors are authorized to reconcile and allow Administrative Claims without further order of the Bankruptcy Court, which claims shall be deemed allowed in the agreed amounts after the

Committee is provided seven business days' notice of such proposed reconciled and allowed amount and does not object thereto.

<u>**Subsequent Communications With ETG Regarding**<br>**Administrative Claims And Assignments**</u>

41.     After April 10 and through October 2018, counsel for LNC and Talbot's exchanged multiple emails and phone calls with ETG's counsel regarding the Administrative Claims, the Debtors' reconciliation and proposed allowance of those claims in slightly reduced amounts, the Bankruptcy Court's approved procedures regarding allowance of administrative claims, and various other bankruptcy motions and proposed procedures potentially affecting the Administrative Claims in order to permit ETG to object or consent to any matters potentially affecting the Account Claims to be assigned under the Put Agreement and in an effort to prevent ETG from later asserting that LNC took any action or failed to take any action not approved by ETG resulting in impairment of the Account Claims.

42.     By email dated June 28, 2018, the Debtors provided LNC and Talbot's counsel with their proposed reconciliation of the Administrative Claims, indicating that they were agreeable, subject to Committee review, to allowance of the LNC Administrative Claim in the slightly reduced, reconciled amount of $723,329.19 and of the Talbot's Administrative Claim in the slightly reduced, reconciled amount of $33,779.34.

43.     On July 31, 2018, counsel for LNC and Talbot's emailed to ETG and its counsel the Debtors' proposed reconciliation of the Administrative Claims and inquired whether ETG consented to the allowance of the Administrative Claims in the slightly reduced, reconciled amounts set forth therein.  By email dated August 1, 2018, ETG's counsel confirmed receipt of the July 31 email.

44.     By emailed correspondence dated August 9, 2018, counsel for LNC and Talbot's informed ETG and its counsel about an Opt-Out procedure the Bankruptcy Court had established for holders of Administrative Claims pursuant to the terms of a court-approved Settlement Agreement reached among Toys Delaware, certain other Debtors, and certain other stakeholders and notified ETG of the deadline for submitting the applicable opt-out form. Counsel for LNC and Talbot's also inquired whether ETG wanted LNC and/or Talbot's to submit an opt-out form opting out of the terms of the approved settlement with respect to either of the Administrative Claims and advised that if no response was received from ETG by the deadline, no opt-out form would be submitted with respect to either claim.

45.     By email dated August 15, 2018, counsel for ETG advised that ETG had received the information regarding the opt-out procedure and stated, "[W]ithout waiving any rights, we are advising that we agree that no opt-out is necessary (per your August 9, 2018 letter)." A copy of the August 15 email is attached as **Exhibit 6** hereto.

46.     By letter dated September 6, 2018, ETG stated "In response to your August 22, 2018 email, ETG does not object to the reduced claim amounts." In addition, ETG stated that "ETG reserves all of its rights under the [Master Agreement] and Assignment of Claim Agreement and hereby does not waive any such rights." A copy of the September 6, 2018 email is attached as **Exhibit 7** hereto.

47.     By email dated September 7, 2018, counsel for the Debtors sent counsel for LNC and Talbot's an email with the Debtors' proposal for documenting allowance of the Administrative Claims in the reduced, reconciled claim amounts.

48.     By correspondence dated September 11, 2018, counsel for LNC and Talbot's forwarded the Debtors' proposal for documenting allowance of the Administrative Claims,

15

together with a sample form of Notice of Allowed Claims that the Debtors proposed to file under the procedure established by the Administrative Claims Procedures Order (the "Notice Procedure"). LNC and Talbot's counsel explained Sellers' position that allowance of the Administrative Claims pursuant to the Debtors' proposed Notice of Allowed Administrative Claims, together with the Administrative Claims Procedures Order (and in particular paragraph 18 thereof), would satisfy the "final order" requirement of the Master Agreement and Form of Assignment of Claim Agreement. In addition, in order to avoid future litigation over the issue, counsel sought ETG's written confirmation agreeing that resolution of the Administrative Claims pursuant to the Debtors' proposed Notice Procedure would satisfy the final order requirement of the Master Agreement and Form of Assignment of Claim Agreement.

49.     After several follow up emails by Sellers' counsel and evasive responses by ETG's counsel, by email dated September 14, 2018, ETG's counsel responded to the September 11 correspondence as follows:

> We are not at the point to determine whether the procedure does in fact reach the level of a Final Order. However, we agree that your client should agree to the procedure in order for these claims being included in the initial distribution under the Plan.

After several additional emails between the parties, ETG's counsel refused to consent to the proposed Notice Procedure or agree to any other specified procedure for satisfying the "final order" requirement of the Put Agreement, but simply stated, "[M]y client is not inclined to change the requirements in the contract. A Final Order, as defined in the agreement, is required." Copies of the September 11 and September 14 correspondence and related correspondence between Sellers' counsel and ETG's counsel on this subject is attached as **Exhibit 8** hereto.

50.     In October 2018, Sellers' counsel again attempted on several occasions to discuss with ETG's counsel what they would require in terms of a procedure for documenting the parties' resolution of the Administrative Claims in order to meet the "final order" requirements of the Put Agreement to ETG's satisfaction, but ETG's counsel repeatedly failed to answer or return any of Sellers' counsel's phone calls.

51.     Just a few weeks later, on November 12, 2018, and again on December 11, 2018 and March 5, 2019, in lawsuits filed against ETG concerning unfulfilled put agreements involving substantially similar terms to the Put Agreement attached as Exhibit 1 hereto and entered into by other sellers of Account Claims in connection with the Debtors' Bankruptcy Case, ETG clearly stated its position that allowance of administrative claims pursuant to the Notice Procedure originally proposed by the Debtors on September 7, 2018 constitutes a final order satisfying the "specific and unambiguous requirements of the [Master Agreement] and the [Form] Assignment of Claim Agreement."  *See Defendant's Memorandum Of Law In Support Of Motion To Dismiss*, DGL Group Ltd. and Happy Threads LLC v. ETG Capital Advisors LLC, Supreme Court of the State of New York, County of New York, Index No. 655266/2018 [Doc. No. 59], at pp. 7, 13 (noting the correct defendant is ETG Capital LLC) and 16-17; *Defendant's Memorandum Of Law In Support Of Motion To Dismiss*, DGL Group Ltd. and Happy Threads LLC v. ETG Capital Advisors LLC and ETG Capital LLC, Supreme Court of the State of New York, County of New York, Index No. 655266/2018 [Doc. No. 171], at pp. 16-17; *see also Defendant's Memorandum Of Law In Support of Motion To Dismiss*, Kolcraft Enterprises, Inc. v. ETG Captial LLC and Maglan Distressed Master Fund LP, Supreme Court of the State of New York, County of New York, Index No. 655266/2018 [Doc. No. 12], at pp. 8-9.  Copies of these pleadings are attached as **Exhibit 9** hereto.

**Allowance of Talbot's Administrative Claim And**
**Acceptance Of Talbot's Assignment By ETG**

52.     On October 8, 2018, the Debtors filed a *Second Notice of Allowed Administrative Claims* (the "Second Allowance Notice") pursuant to the Notice Procedure and the Administrative Claims Procedures Order, in which the Debtors provided notice of their agreement and determination to allow the Talbot's Administrative Claim (which has been assigned claim number 17967 in the Debtors' bankruptcy proceedings) against Toys Delaware in the full amount filed of $34,349.60 (not the reduced reconciled amount previously proposed by Debtors).  A copy of the Second Allowance Notice is attached as **Exhibit 10** hereto.

53.     Accordingly, on October 8, 2018, the Talbot's Administrative Claim was allowed by final order of the Bankruptcy Court within the meaning of section 5 of the Master Agreement and Sections 2 and 6 of the Talbot's Assignment Agreement (defined below).

54.     Talbot's subsequently received a check dated October 12, 2018 in the amount of $5,324.18 as a distribution from the Debtors' bankruptcy estate on account of the Talbot's Administrative Claim and promptly informed ETG of the same.

55.     On October 29, 2018, in accordance with sections 5 and 8 of the Master Agreement, Talbot's timely sent to ETG, via UPS overnight mail and email (at the notice addresses set forth in the Master Agreement) the following:  (i) a Form of Assignment of Claim Agreement in substantially the same form as Exhibit B to the Master Agreement, executed by Talbot's, assigning the Talbot's Administrative Claim to ETG pursuant to the terms thereof and attaching all of the Schedules and Exhibits required by Section 8 of the Master Agreement (the "Talbot's Assignment Agreement"); (ii) a copy of the Master Purchase Order Agreement between Talbot's and Toys Delaware; (iii) a summary chart of the invoices supporting the Talbot's Administrative Claim and copies of all of the supporting invoices and delivery

documents; and (iv) copies of bankruptcy pleadings pertaining to the Talbot's Administrative Claim (collectively, the "Talbot's Assignment Documents").  In addition, Talbot's demanded ETG's performance under the Put Agreement and payment of the Schedule Purchase Price. Copies of the Talbot's Assignment Documents (except the bankruptcy pleadings and the supporting invoices and delivery documents, which are voluminous) are attached as **Exhibit 11** hereto.

56.     By email dated October 31, 2018, ETG confirmed receipt of the Talbot's Assignment Documents.  A copy of this confirmation is attached as **Exhibit 12** hereto.

57.     On November 14, 2018, as Talbot's had not yet received any payment or response to the Talbot's Assignment Documents and demand for payment of the Schedule Purchase Price, counsel for LNC and Talbot's emailed to ETG offers that LNC and Talbot's had recently received from Contrarian Capital Management, L.L.C. to purchase the LNC Administrative Claim for a payment of $156,125.31 and to purchase the Talbot's Administrative Claim for a payment of $7,385.16, and counsel reminded ETG that the deadline for ETG to close the Talbot's assignment transaction was November 20, 2018.

58.     By email dated November 19, 2018, ETG approved the assignment of the Talbot's Administrative Expense Claim and agreed to pay $29,025.42 to Talbot's for the assignment (i.e., the $34,349.60 allowed Talbot's Administrative Claim amount less the $5,324.18 distribution already received by Talbot's thereon).  Talbot's received payment of the $29,025.42 by wire transfer from ETG on November 21, 2018.

### Allowance Of LNC Administrative Claim And Breach Of Put Agreement By ETG

59.     On December 19, 2018, the Debtors filed a *Fourth Notice of Allowed Administrative Claims* (the "Fourth Allowance Notice") pursuant to the Notice Procedure and the

Administrative Claims Procedures Order, in which the Debtors provided notice of their agreement and determination to allow the LNC Administrative Claim (which has been assigned claim number 17966 in the Debtors' bankruptcy proceedings) against Toys Delaware in the full amount filed of $726,164.25 (not the reduced reconciled amount previously proposed by Debtors).  A copy of the Fourth Allowance Notice is attached as **Exhibit 13** hereto.

60.     Accordingly, on December 19, 2018, the LNC Administrative Claim was allowed by final order of the Bankruptcy Court within the meaning of section 5 of the Master Agreement and Sections 2 and 6 of the LNC Assignment Agreement (defined below).

61.     On December 29, 2018, in accordance with sections 5 and 8 of the Master Agreement, LNC timely sent to ETG, via UPS overnight mail and email (at the notice addresses set forth in the Master Agreement) the following:  (i) a Form of Assignment of Claim Agreement in substantially the same form as Exhibit B to the Master Agreement, executed by LNC, assigning the LNC Administrative Claim to ETG pursuant to the terms thereof and attaching all of the Schedules and Exhibits required by Section 8 of the Master Agreement (the "LNC Assignment Agreement"); (ii) an internet link to the terms of LNC's Master Purchase Order Agreement with Toys Delaware; (iii) a summary chart of the invoices supporting the LNC Administrative Claim and copies of all of the supporting invoices and delivery documents; and (iv) copies of bankruptcy pleadings pertaining to the LNC Administrative Claim (collectively, the "LNC Assignment Documents").  In addition, LNC demanded that ETG return an executed copy of the LNC Assignment Agreement and make payment to LNC of the $726,164.25 Schedule Purchase Price in accordance with the terms of the Put Agreement (the "LNC Demand").  Copies of the Talbot's Assignment Documents (except the bankruptcy pleadings and

the supporting invoices and delivery documents, which are voluminous) are attached as **Exhibit 14** hereto.

62.     The UPS package with the LNC Assignment Documents was delivered to ETG on January 2, 2019.  Further, LNC did not receive any error message that any of the emails to ETG or its counsel of the LNC Assignment Documents were not received.  Accordingly, pursuant to Section 5 of the Master Agreement, ETG was required to purchase the LNC Administrative Claim and pay the Schedule Purchase Price of $726,164.25 no later than January 22, 2019.

63.     On January 2, 2019, LNC received a check dated December 21, 2018 in the amount of $127,078.74 as a distribution from the Debtors' bankruptcy estate on account of the LNC Administrative Claim.  Counsel for LNC promptly informed ETG and its counsel of the same and indicated that LNC would retain the check until ETG determined whether it wanted the check applied to reduce the Schedule Purchase Price payment (as it had done with the Talbot's claim assignment) or forwarded to ETG once the full Schedule Purchase Price was paid and the LNC claim assignment transaction was closed.  A copy of this correspondence is attached as **Exhibit 15** hereto.  Neither ETG nor its counsel ever responded to this inquiry.

64.     By emails dated January 21, 2019 and January 29, 2019, counsel for ETG indicated that his client contact with ETG had been out of the office and that they would review the LNC Assignment Documents and respond to LNC shortly.

65.     By letter dated February 10, 2019, ETG responded to the LNC Assignment Documents and the LNC Demand by asserting that "ETG does not agree that a Specified Event has taken place."  Specifically, ETG asserts that the Wind-Down Order "does not (i) convert the [Toys Delaware] chapter 11 case to a chapter 7 case, (ii) authorize [Toys Delaware] to cease operating its business in the ordinary course, (iii) confirm any liquidation plan, yet along [*sic*]

one to commence an orderly liquidation of its assets, or (iv) authorize [Toys Delaware] to make any distributions."  ETG further asserted that "since no Specified Event occurred within the Confirmation time period, no purchase is necessary pursuant to the terms of the [Master Agreement] and the Confirmation."  A copy of the February 10, 2019 letter is attached as **Exhibit 16** hereto.

66.     Prior to February 10, 2019, neither ETG nor its counsel ever informed LNC or its counsel of ETG's purported view that the Wind-Down Order did not constitute a Specified Event or that no Specified Event had taken place within the Confirmation time period.

### FIRST CAUSE OF ACTION
**(Breach Of Contract Against ETG)**

67.     Plaintiff repeats and re-alleges all allegations contained in the paragraphs above as if fully set forth and restated herein.

68.     The Put Agreement constitutes a valid and enforceable contract.

69.     The Master Agreement and Confirmation are supported by adequate consideration, which was paid by LNC and Talbot's and received by ETG.

70.     The Wind-Down Order, entered by the Bankruptcy Court on March 22, 2018, authorized Toys Delaware to cease operating its business in the ordinary course, and thus constitutes a Bankruptcy Event within the meaning of section 1 of the Master Agreement.

71.     Accordingly, a Specified Event, within the meaning of sections 1 and 4 of the Master Agreement and Item 10 of the Confirmation, occurred prior to the applicable Expiration Date set forth in the Confirmation.

72.     LNC timely issued the LNC Assignment Notice to ETG in accordance with the terms of section 4 of the Master Agreement.

73.     The LNC Administrative Claim was allowed by final order of the Bankruptcy Court within the meaning of the Master Agreement and the LNC Assignment Agreement on December 19, 2018.

74.     LNC timely executed the LNC Assignment Agreement and delivered the LNC Assignment Documents to ETG, in accordance with sections 5 and 8 of the Master Agreement, and satisfied all other conditions set forth in section 8 of the Master Agreement as of January 2, 2019 at the latest, which was on or prior to the twenty-fifth (25th) day after the LNC Administrative Claim was allowed by a final order of the Bankruptcy Court (including an approved settlement).

75.     Thus, despite ETG's and its counsel's refusal to cooperate in good faith and their repeated attempts to delay, hinder, and frustrate LNC's timely performance of its obligations under the Put Agreement, as of January 2, 2019, LNC had timely and fully performed all obligations and met all conditions precedent under the Put Agreement entitling it to ETG's performance thereunder.

76.     Thus, pursuant to section 5 of the Master Agreement, ETG was required to close the sale, pay the Specified Purchase Price, and purchase the LNC Administrative Claim within 5 to 20 days after January 2, 2019, or no later than January 22, 2019.

77.     ETG, in bad faith, has failed and refused to close the LNC claim assignment transaction, pay the Specified Purchase Price, or purchase the LNC Administrative Claim pursuant to its obligations under the Put Agreement.

78.     Accordingly, ETG has breached its obligations to LNC under the Put Agreement.

79.     As the direct and proximate result of ETG's breach of the Put Agreement, LNC has suffered damages in the amount of not less than $599,085.51 (i.e., the Schedule Purchase

Price of $726,164.25 less the $127,078.74 distribution that LNC received from the Debtors' bankruptcy estate on account of the LNC Administrative Claim), plus pre-judgment and post-judgment interest thereon at the legal rate until paid, costs, disbursements, and fees, including attorneys' fees, accrued and accruing in connection with this action.

## SECOND CAUSE OF ACTION
### (Monies Due And Owing Under Guaranty Against Maglan)

80. Plaintiff repeats and re-alleges all allegations contained in the paragraphs above as if fully set forth and restated herein.

81. Pursuant to the terms of the Guaranty contained in the Confirmation, Maglan agreed to guarantee the payment obligations of ETG to LNC under the Put Agreement.

82. The Guaranty was accepted by LNC and Talbot's and entered into by Maglan contemporaneously with the parties' entering into the Put Agreement.

83. The Guaranty was a substantial part of the consideration that induced LNC to enter into the Put Agreement with ETG.

84. ETG has breached its payment obligations to LNC under the Put Agreement.

85. Pursuant to the terms of the Guaranty, Maglan is liable to LNC for the full amount of ETG's payment obligations to LNC under the Put Agreement.

86. Maglan received notice of LNC's demand for ETG to perform its payment obligations under the Put Agreement as Mr. Azarbad, the Managing Member of ETG and the Managing Member of Maglan's General Partner, was copied on the LNC Notice of Assignment and the December 29, 2018 LNC Demand, including all of the LNC Assignment Documents.

87. In addition, upon information and belief, Mr. Azarbad, as the Managing Member of ETG, also presumably reviewed and approved ETG's counsel's February 10, 2019 response to the LNC Demand.

88.    Notwithstanding the foregoing, Maglan has failed to pay to LNC the monies owing to LNC by ETG under the terms of the Put Agreement.

89.    Accordingly, Maglan is liable to LNC on the Guaranty in the amount of $599,085.51 (i.e., the Schedule Purchase Price of $726,164.25 less the $127,078.74 distribution that LNC received from the Debtors' bankruptcy estate on account of the LNC Administrative Claim), plus pre-judgment and post-judgment interest thereon at the legal rate until paid, costs and disbursements.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment as follows:

A.      Awarding compensatory damages against ETG in the amount of $599,085.51;

B.      Awarding compensatory damages against Maglan in the amount of $599,085.51;

C.      Awarding pre-judgment and post-judgment interest at the legal rate until paid in

full;

D.      Awarding Plaintiff its costs, disbursements, and fees, including reasonable

attorneys' fees; and

E.      Granting such other, further and different relief as the Court may deem just,

equitable and proper.

Dated:  May 13, 2019

Respectfully submitted,

_____*/s/ Thomas R. Slome*_____
Thomas R. Slome
Michael Kwiatkowski
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
Telephone:  (516) 741-6565
Facsimile:  (516) 741-6706
Email: tslome@msek.com
       mkwiatkowski@msek.com

and

Russell R. Johnson III (VSB No. 31468)
John M. Craig (VSB No. 32977)
Law Firm Of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862
E-mail:  russell@russelljohnsonlawfirm.com
        john@russelljohnsonlawfirm.com

*Counsel for Plaintiff Luv n' care, Ltd.*

3" = "3" "4251793" "" 4251793